IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 13, 2022

## JOE EDWARD DANIELS v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Jackson County**
**No. 08CR93  Brody N. Kane, Judge**

_____

### No. M2021-00113-CCA-R3-PC

_____

Petitioner, Joe Edward Daniels, appeals as of right from the Jackson County Criminal Court's denial of his petition for post-conviction relief, wherein he challenged his convictions for first degree premeditated murder, tampering with evidence, abuse of a corpse, and various traffic violations.  On appeal, Petitioner asserts that he received ineffective assistance of counsel based on trial counsel's failure to: (1) conduct a reasonable investigation or utilize a criminal defense investigator; (2) object when the trial court indicated it would not charge the jury with attempt; and (3) request a jury instruction on facilitation of a felony.  Petitioner contends that the cumulative effect of trial counsel's deficient performance rendered his trial fundamentally unfair and justifies the granting of a new trial.  Following a thorough review, we affirm.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, P.J., and KYLE A. HIXSON, J., joined.

Gordon A. Byars, Cookeville, Tennessee, for the appellant, Joe Edward Daniels.

Herbert H. Slatery III, Attorney General and Reporter; Samantha L. Simpson and Ronald L. Coleman, Assistant Attorneys General; Tom P. Thompson, Jr., District Attorney General; and James Lea, Jr., and Ian D. Bratton, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**Factual and Procedural Background**

Following a trial, a Jackson County jury found Petitioner guilty of first degree premeditated murder, tampering with evidence, abuse of a corpse, failure to give notice of an accident, leaving the scene of an accident, driving on the wrong side of the road, and failure to use due care. *See State v. Joe Edward Daniels*, No. M2015-01939-CCA-R3-CD, 2017 WL 1032743, at *1 (Tenn. Crim. App. Mar. 16, 2017), *perm. app. denied* (Tenn. July 20, 2017). For these convictions, the trial court sentenced Petitioner to a total effective sentence of life. *Id*. at *6.

On direct appeal, this court summarized the evidence presented at trial, as follows:

[Petitioner] was charged in this case after police discovered the corpse of the victim, Walter Greg ("Greg") King, in the woods near [Petitioner's] wrecked, blood-covered pickup truck. An autopsy revealed that the victim had been shot in the back of the head by a shotgun. The State sought to show at trial that the victim was last seen with [Petitioner] and that various pieces of physical evidence tied [Petitioner] to the crime. [Petitioner] sought to establish through his wife's testimony that the victim had been shot by [Petitioner's] uncle in the heat of passion during a struggle for a gun.

On August 19, 2008, the victim resided at the Cherry Tree apartment complex in Celina, Tennessee. Robert Kevin Sloan performed maintenance for the apartment complex and was a friend of both the victim and [Petitioner]. Mr. Sloan testified that the victim was disabled as the result of a car accident that had left him in a coma for several months. The victim walked with a cane and had difficulty moving around. Mr. Sloan described the victim as clean-cut and neat, and he testified that the victim had one tattoo on his arm and another on his forearm. Marion Beck and Theresa Vincent, who also lived at the complex, confirmed that the victim had difficulty walking, and Ms. Beck stated the victim used a cane or held onto things when he walked.

[Petitioner], his wife, and his sons also lived at the apartment complex. Mr. Sloan testified that on August 19, 2008, [Petitioner] was in the process of moving out of his apartment. Mr. Sloan was painting the apartment as [Petitioner] and his wife cleaned and moved furniture into a residence across the street; [Petitioner's] children were playing in the parking lot. Mr. Sloan testified that the victim and [Petitioner] were "somewhat"

- 2 -

friends, and he stated that on that day, the two were sitting on the porch together. [Petitioner] and [the] victim went two or three times in [Petitioner's] white Ford pickup truck to get beer and cigarettes, and Mr. Sloan, [Petitioner], and the victim each drank approximately four to six beers. The victim and [Petitioner] returned from their second trip at around 3:00 p.m. The last time Mr. Sloan saw the victim, the victim told him that "they were going to make another beer run." Mr. Sloan saw [Petitioner] and [the] victim leave in [Petitioner's] truck and never saw the victim again.

Mr. Sloan acknowledged that he had been an alcoholic at the time and probably drank twelve or more beers that day, and he acknowledged that he was probably drinking when he spoke to police the next day. Mr. Sloan also acknowledged telling police that he did not think the victim left with [Petitioner] but believed he left with a man with a tattoo on his neck and a ponytail. He explained that he did see the man with the tattoo "come in and out of the store where [Petitioner's] wife worked." He also explained that at the time he made this statement, he thought [Petitioner's] truck was sitting at [Petitioner's] brother's house but he later realized that the truck at [Petitioner's] brother's house did not belong to [Petitioner]. It was instead a similar truck that could be distinguished because it had a tire in the bed whereas [Petitioner's] truck did not. Mr. Sloan testified he later told police he was mistaken about the truck's location.

Ms. Beck and Ms. Vincent also testified to last seeing the victim with [Petitioner] at the apartment complex. Ms. Beck stated that she saw [Petitioner] and [the] victim leaving together around dusk or dark. [Petitioner] was driving a white truck and the victim was a passenger. Ms. Beck never saw the victim alive again. Ms. Vincent testified that the victim came to her home for coffee in the morning. The victim stopped in again when Ms. Vincent's daughter was home. Ms. Vincent testified that based on her daughter's work schedule, the victim's second visit must have been at noon or at 3:00 p.m. Ms. Vincent was lying on the couch with her eyes closed, and the victim took her to be asleep and told her daughter he would be "back in a few minutes." Ms. Vincent looked out of the window and saw him get into the passenger's side of a pickup truck she recognized as [Petitioner's] truck. She only saw the driver's arm and cap and testified she could not be sure the driver was [Petitioner]. She acknowledged telling police that the driver was [Petitioner] and explained that she inferred [Petitioner] was the driver because it was his truck and she had not seen anyone else drive it. At trial, Ms. Vincent testified that she could not recall if it was [Petitioner's] white or red pickup truck that they left in, but stated

- 3 -

that if she had at the time told police that it was a white truck, her statement would be correct.

At 10:45 p.m. on August 19, 2008, Trooper Edwin Crouch was called to examine a wrecked vehicle on Sugar Creek Road. The vehicle was a white Ford pickup truck which had gone down an embankment. Skid marks on the roadway and through the rock indicated the path the truck had taken. The driver was not with the vehicle. Trooper Crouch noticed "a lot" of blood on the tailgate of the truck and in the bed, and he saw fingerprints and handprints in the blood on the car. Because the truck was registered to [Petitioner], Trooper Crouch tried to locate [Petitioner] at hospitals and at his last known address, where he was no longer living. [Petitioner] was not at the scene and did not notify police of the accident. The truck was put in a secured, indoor facility by the towing company. Trooper Crouch acknowledged that the wreck looked like someone "just missed the curve." A video of the scene was introduced into evidence but is not part of the appellate record.

The next day, at approximately 6:00 or 6:30 p.m., Lisa Bybee was riding her bicycle on Sugar Creek Road. She saw two dogs at the side of the road, and she noticed that one was near a corpse which was about twenty-five feet from the road. She rode home, called 911, and returned in her vehicle to direct emergency personnel to the area with the body. Ms. Bybee testified that the body was near the old bridge and near the house of Robert Daniels, who was identified in other testimony as [Petitioner's] uncle.

Agent Jason Wilkerson with the Tennessee Bureau of Investigation ("TBI") responded to the discovery of the victim's body. Agent Wilkerson testified that the body was approximately 300 yards from [Petitioner's] wrecked truck. There was blood in the roadway above the body and major trauma to the victim's head, along with "scavenger activity." Agent Wilkerson described the victim's body as a Caucasian male lying face down nineteen feet off the road down an embankment. His body was nude, but there was a shirt wrapped around his waist. Agent Wilkerson collected evidence from the site, including a pair of bloody shorts found near the body and two swabs taken from the reddish[-]brown substance in the roadway above the body. He also collected a baseball cap, bottle, lighter, and blood-speckled leaves near the site of the wreck. Agent Wilkerson had the white truck put inside a trailer and moved to the TBI for analysis. Trooper Crouch, who returned to the scene, testified that the body appeared as though it had been dragged because of the way the feet were lying and the shirt was rolled down. Agent Shannon Brown measured and documented the scene and

- 4 -

testified that the corpse and vehicle were found near a residence belonging to [Petitioner's] uncle, Robert Daniels.

Agent Wilkerson tried to contact [Petitioner], who was in Indiana. [Petitioner's] wife called Agent Wilkerson a number of days after the body was found and said that [Petitioner] would meet with him. Agent Wilkerson met [Petitioner] and his wife at a highway patrol station, and [Petitioner] claimed he had not been driving the truck at the time of the homicide and did not know what happened to the victim. [Petitioner] told Agent Wilkerson, "[I]f I did know what happened, I would be afraid to say. I have four boys and I don't want what happened to Greg to happen to them."

Agent Wilkerson took DNA samples from [Petitioner] and his wife and took [Petitioner's] fingerprints. He also retrieved fingerprints taken from the victim by the medical examiner. He acknowledged that [Petitioner's] uncle, Robert Daniels, was also charged in connection with the murder and that a case against Mr. Daniels was pending.

Jim Morgan, the Jackson County coroner, testified that the victim's body was found fifteen to twenty feet from the road. At first, responders believed the body originated from the wreck, but Mr. Morgan questioned that conclusion based on large wounds to the head and neck. He ordered an autopsy and arranged transportation to Nashville, but he did not take the body there himself.

The State called Dr. Amy McMaster, a forensic pathologist[.]

. . . .

Dr. McMaster testified that she performed the autopsy on the victim on August 21, 2008. The victim's toxicology results showed that he had anti-seizure medication, two anti-depressants, and alcohol in his system at the time of death. She testified that the alcohol level in his urine, which was .22 percent, would not necessarily correlate to his blood alcohol level. The victim's body was beginning to decompose and suffered from "postmortem carnivore activity" around the head and neck. However, she was able to determine that he had a large, round "defect" on the back left of his skull due to a shotgun wound. Dr. McMaster recovered birdshot pellets from his skull and brain. The hole in the victim's head was well-defined, and she estimated that the gun was fired within a few feet. She stated that no soot was visible and that the shot was most likely fired from closer than ten feet. She stated

that the type of "wound pattern" suffered by the victim could be produced during a struggle. Defense counsel asked Dr. McMaster, "And if a person— if a gun is being pointed at them and they turn their head then it would hit right in that area, wouldn't it?" However, Dr. McMaster disagreed, stating that "those two scenarios are, in my opinion, mutually exclusive," elaborating that she believed that the victim's wound was inconsistent with a struggle for the gun. Dr. McMaster testified that the path of the wound was left to right and slightly back to front. She determined that the manner of death was homicide.

Agent Wilkerson, testifying after Dr. McMaster, stated that he recognized the body at the autopsy as the one from the road based on height, weight, state of decomposition, and tattoos. After Dr. McMaster's testimony, the State presented the testimony of Jeff Davenport, a paramedic who transported the body from Sugar Creek Road to the Emergency Medical Services Center. He stated that he left the body at the center and that he believed Mr. Morgan was there at the time. Brian Horton testified that he received paperwork from Mr. Morgan and that he then transported the body from the Ambulance Service to the medical examiner's office in Nashville. Agent Hunter Greene of the TBI testified that the fingerprints of the deceased taken by the medical examiner matched the known prints of the victim.

Agent Greene also conducted fingerprint analysis on the white truck. She recovered five latent prints that were of value from the truck. [Petitioner's] right palm print appeared twice on the tailgate. His left middle fingerprint was on the driver's side, and his right palm and left thumbprint were on the passenger's side. One of the palm prints was in the same area that was the source of a blood sample which contained the victim's DNA. Agent Greene testified that blood would "pretty much" cover pre-existing fingerprints on a surface. After examining the patterns of the fingerprints in the blood, she concluded that the blood in the fingerprints was on [Petitioner's] hand first and was then transferred to the truck when he touched the surface.

Agent Patrick Ihrie of the TBI examined the DNA samples submitted by Agent Wilkerson. Agent Ihrie testified that the two blood swabs from the road, the blood on the shorts, and the blood on the leaves near the crash site contained the victim's DNA. The victim's DNA was also found on the tailgate of the white truck, in two samples taken from the bed of the truck, and in a spot of blood below the driver's armrest in the truck's interior. Agent Ihrie could only obtain a partial DNA profile from the hat found near the

crash site. The DNA he found was a mixture from two individuals. The major contributor was consistent with [Petitioner's] DNA, and [Petitioner's] wife could not be excluded as the minor contributor.

[Petitioner's] wife, Kim Daniels did not appear when first summoned, and the State presented her testimony as that of a hostile witness. Ms. Daniels testified in support of [Petitioner's] claim that the victim was shot by someone else, was shot by accident, and was shot in the heat of passion. Ms. Daniels had been married to [Petitioner] for ten years at the time of trial, and they had four children together. On August 19, 2008, Ms. Daniels went to Jamestown on an errand with three children: an infant, a two-year-old, and a four-year-old. Ms. Daniels's car had a flat tire, and she got a ride from a stranger to her destination, where she called [Petitioner] to help her. She acknowledged that she was upset that [Petitioner] was drinking that day. [Petitioner] and [the] victim fixed the tire and then took her and the children to the car. She rode with the baby in the passenger's seat, and the two young boys and the victim rode in the bed of the truck. [Petitioner] and the victim left after they returned to Celina, and she never saw the victim again.

Ms. Daniels testified that [Petitioner] came home in the middle of the night with a cut on his forehead and asked her to clean the cut. He said he was going to his sister's home in Indiana. She did not recall telling Agent Wilkerson that he told her he had "messed up." On August 20th, [Petitioner] called her to ask if his truck was back. He instructed her to report it stolen, and she did so. Ms. Daniels met with [Petitioner] in Indiana about two days after the victim's death. There, [Petitioner] told her his version of events.

According to what [Petitioner's] wife testified he told her, [Petitioner] and [the] victim went to the house of [Petitioner's] uncle, Robert Daniels, and the three were drinking and began discussing sex. [Petitioner] told his wife that the victim asked them if they had "ever messed around with a boy before, and they said, no." [Petitioner's] wife testified:

> And I don't remember exactly what all he said was said, but then Greg said that he had—Greg expressed like an interest in our son . . . , and then Bob got angry and went in his house and got a gun and loaded it, and Greg said he didn't have the nerve, and Bob put the gun up to his head and they all three struggled over it and it discharged.

Ms. Daniels clarified that [Petitioner] had told her that his uncle, Robert Daniels, had the gun when it went off and that [Petitioner] told her that he did not have the gun. She also testified that she told the TBI that approximately one week before the shooting, the couple's children were missing and [Petitioner] found them at the victim's house. She testified that her son was four at the time.

Ms. Daniels acknowledged that she and [Petitioner] went to Kentucky, where they registered under a false name at a motel. Eventually, she took [Petitioner] to meet a TBI agent at a highway patrol station. She acknowledged that she "might have" told Agent Wilkerson that [Petitioner] told her "that he took the body and he put it in the back of his truck and then he dumped the body and then he had a wreck and then he went back across the creek to his Uncle Bob's house."

The State tried to elicit testimony from Ms. Daniels regarding prior statements she had made to law enforcement regarding [Petitioner's] suspicions that the victim and Ms. Daniels were having an affair. Ms. Daniels denied telling Agent Wilkerson that [Petitioner] accused her of having an affair with the victim or with Mr. Sloan based on a hair he found in the bathroom. She did not recall telling Agent Wilkerson that [Petitioner] asked, "[D]id I bring the right boyfriend with me?" when he came to get her in Jamestown. She did not recall telling Agent Wilkerson that [Petitioner] again accused her of having an affair with the victim when they returned to Celina before the victim and [Petitioner] went to get beer. She denied that the victim had ever shown romantic interest in her.

. . . .

During trial, the parties discussed jury instructions with the court, and the prosecution noted that it did not believe attempt should be charged because the victim was deceased. Defense counsel stated that he "could conceive" of a case where the defendant attempts to kill the victim but the victim dies by another hand, although counsel acknowledged he was "not saying this case will be one." The trial court essentially expressed a belief that failure to charge a lesser-included offense could never be reversible error when the defendant was convicted of the greater offense due to the fact that the jury was instructed to acquit on the greater offense prior to considering the lesser. The trial court asked the defense if it had any objections to the decision not to charge attempt, and the defense responded that it did not.

. . . .

The prosecution also . . . asked the trial court to charge the jury with criminal responsibility. The prosecution reasoned that [Petitioner's] wife, who was the last witness due to the fact that she did not appear on the day she was scheduled to testify, had introduced a theory that [Petitioner's] uncle was the one who pulled the trigger during the shooting of the victim. [Petitioner] objected to the instruction on criminal responsibility, but the prosecution argued that the proof from [Petitioner's] wife justified the instruction. The jury was instructed on criminal responsibility.

The jury found [Petitioner] guilty of first degree murder, tampering with evidence, and abuse of a corpse. The jury also convicted [Petitioner] of four traffic violations[.]

*Id.* at \*1-6 (citations omitted). This court affirmed Petitioner's judgments of conviction, and the Tennessee Supreme Court denied further review. *Id*. at \*1.

Petitioner subsequently filed a timely pro se petition for post-conviction relief, alleging that he was denied the effective assistance of counsel. Following the appointment of counsel, Petitioner filed an amended petition. At an evidentiary hearing,[1] trial counsel testified that he was employed as an Assistant District Public Defender for the 15th Judicial District. Trial counsel stated that he had been with the Public Defender's Office for twenty-one years and that he had been practicing law for forty years. Counsel said that he represented Petitioner, along with co-counsel. He recalled that he and co-counsel worked from a "joint file." He said that he represented Petitioner at trial and on direct appeal. Trial counsel said that, during his representation of Petitioner, he and Petitioner communicated through letters and that he met with Petitioner "quite a bit." He explained, "I probably had more one on one contact with [Petitioner] than any other defendant I've had in years." Trial counsel stated that he received letters from other attorneys who had represented Petitioner on other matters. He also spoke to family members and some witnesses about Petitioner.

Trial counsel testified that the theory of defense at trial was that Petitioner did not kill the victim and that Robert Daniels committed the murder. Counsel said that the State had evidence that showed Petitioner was involved, such as Petitioner's and the victim's DNA in the pickup truck. He explained, however, that there was evidence that Robert Daniels was "the primary culprit[.]" Trial counsel stated that he investigated Robert

---

[1] Our summary of the facts established at the evidentiary hearing is limited to those relevant to the issues raised by Petitioner on appeal.

Daniels and that he obtained a copy of the indictment against him. He recalled that Robert Daniels' case was severed from Petitioner's prior to trial. Trial counsel said that, while he was questioning Kim Daniels during Petitioner's trial, Robert Daniels caused a disturbance in the courtroom, commenting that the witness was a liar. Trial counsel said that he did not recall addressing the jury about the disruption caused by Robert Daniels. Counsel stated, however,

> [T]he jurors heard the outburst and I think I was arguing that based on Kim Daniels['] testimony that there was a fight. There had been some drinking going on between the individuals involved. [Robert] Daniels went and got the gun, came out and they [were] fighting over the gun. The gun went off and [the victim] was killed. And [Robert Daniels] has kind of made a spectacle of himself here in the courtroom, so I didn't specifically argue it, but I did argue that he's the one . . . that killed [the victim].

Trial counsel agreed that Kim Daniels had been listed as a witness for the State prior to trial and that the trial court had to issue a bench warrant to get her to appear for trial. He recalled that Kim Daniels testified that,

> while they were in Indiana, [Petitioner] told her that they went to [Robert] Daniels' house and they were drinking and [the victim] started asking them if they'd ever had sex with young boys, something along those lines, and they said, no. And . . . that [Robert] Daniels went into the house and got the gun and came back out.

> They wrestled over the gun and the gun went off, and when the gun went off Robert Daniels was in possession of the gun.

Counsel explained that he had not sought to prohibit Kim Daniels' testimony because Petitioner did not want to testify and there was no other witness who could testify that Robert Daniels shot the victim.

Trial counsel recalled that there were two crime scenes—Robert Daniels' residence and the location where Petitioner's truck and the victim's body were found. Counsel agreed that, at the time of Petitioner's case, he had access to an investigator, Gary Mac Foster. He said that he obtained statements from witnesses from the discovery provided by the State. Trial counsel recalled that, one day, he, Mr. Foster, and another Assistant Public Defender with counsel's office, went to Clay County to the apartment building where Robert Daniels lived. Counsel stated:

> I don't recall specifically who we talked to but we did talk to some people.

I also went to the courthouse in Clay County to get certain records. I believe that one of the witnesses, I want to say Kevin Sloan, had some domestic violence maybe . . . something along those lines, and I got a copy of that at the courthouse in Clay County.

Trial counsel stated that he received "a lot of discovery" from the State and that he thoroughly went over the materials with Petitioner. He said that he took his laptop to Petitioner and that they listened to audiotapes. Counsel stated, "As far as spending time with a client, I . . . spent more time with [Petitioner] . . . than any other client I've represented in [forty] years." He stated that he interviewed Kim Daniels numerous times. Counsel further stated:

I mean, there's no reason I had to believe that further investigation [was] necessary here because . . . [Petitioner] confirmed that, yeah, I was with [the victim] earlier that day. So I didn't see any need in further investigating that part of it.

And then Trooper Crouch . . . investigated the accident scene and did measurements and various things and there [were] videos of that. I could have talked to him, I don't know. Pretty much what he's going to say was well documented and we got it in discovery. So, again, I don't think there's much room for any further investigation there.

The same goes for the expert witnesses that the State called. And I really don't really remember there being any need for a competing expert on anything because the DNA wasn't really at issue.

Counsel said that he did most of the investigating of Petitioner's case for the defense and that co-counsel assisted in the investigation.

Trial counsel agreed that he did not formally object to the trial court's failure to provide attempt instructions but said that he argued that it should be included as part of the jury instructions. After the trial court ruled, however, trial counsel believed that it would be "fruitless to continue to argue" and did not formally object. Trial counsel said that he nevertheless believed an attempt instruction was appropriate. Counsel said that he raised the issue of the court's failure to instruct the jury on attempt in Petitioner's motion for new trial and at the motion for new trial hearing.

Trial counsel acknowledged that he did not request an instruction on facilitation of a felony. He acknowledged that, although he raised the issue of the trial court's failure to charge facilitation of a felony in Petitioner's motion for new trial, the trial court found that

- 11 -

Petitioner had waived the issue by failing to request the instruction. On direct appeal, trial counsel requested relief under plain error, which the appellate court denied. Counsel explained that his failure to request the facilitation instruction was not a tactical decision; rather, it was due to his lack of knowledge regarding that area of the law.

On cross-examination, trial counsel agreed that he received discovery from the State and that it contained multiple statements made by Robert Daniels. Counsel stated that, in these statements, Robert Daniels did not say who shot the gun. Counsel said that he never had any indication that Robert Daniels would take responsibility for shooting the victim. Trial counsel testified, "Robert Daniels [was] a person who could have easily got[ten] up there and said, yeah, [Petitioner] did it then calls me to clean the mess up. That's the kind of person Robert Daniels was as far as my view of him." Trial counsel said that he talked to Robert Daniels before Petitioner's trial. He did not recall Petitioner's asking that he call Robert Daniels as a witness. Trial counsel testified that, after the death of Robert Daniels, he visited Petitioner in prison. Petitioner told him for the first time that, during the offense, Robert Daniels hit Petitioner with a wooden stick.

Trial counsel testified that Petitioner's defense took a multi-prong approach. He agreed that the primary trial strategy was that Robert Daniels killed the victim; additionally, he argued that it was a "drunken fight" with a lesser mens rea and that the victim "kind of had it coming" for talking about child molestation. Counsel testified that he had used the testimony of Kim Daniels to pursue each of these prongs of the defense and that she had been the only witness—other than if Petitioner had decided to testify—who could have presented such evidence.

Trial counsel stated that he, Trooper Crouch, Mr. Foster, and another Assistant Public Defender interviewed individuals who resided near Petitioner at the time of the offense. When asked if there was further investigation that he should have pursued in the case, counsel responded:

> Not that I'm aware of because I feel like I had, with discovery and what I knew about the case, the major players in it, I mean, I'm not aware of any witness out there. In all these years nobody has come forward as being a material witness that I know about.

Trial counsel said that he did not recall there being any additional witnesses that Petitioner wanted him to investigate. He recalled that, in speaking to the individuals at the trailer park, they put Petitioner together with the victim earlier in the day—a fact that Petitioner did not deny.

Trial counsel recalled that, during trial, he had several discussions with the trial court about the court's instructing the jury on attempted first degree murder. Counsel stated that he asked the trial court to include the charge but that the court refused to do so. Counsel acknowledged that he did not object to the trial court's refusal. Counsel stated that he had been unaware at the start of trial that the State would request a jury charge on criminal responsibility. He acknowledged that he had been surprised by the request. He testified that, in hindsight, he should have requested that the trial court instruct the jury on facilitation of a felony. Trial counsel acknowledged that the State's theory at trial was not that Petitioner assisted Robert Daniels in the commission of the crime but that it was Petitioner who shot the victim and disposed of the victim's body.

Frank Lannom, an expert in criminal defense, testified that he was a licensed attorney practicing "ninety-nine percent exclusively criminal defense." He stated that he had been in practice in the 15th Judicial District for twenty-seven years and had previously testified as an expert in post-conviction matters. Mr. Lannom explained that, in preparation for the hearing, he had met with the State, post-conviction counsel, and Petitioner and that he had reviewed the evidence and record in Petitioner's case.

Mr. Lannom testified that it would be objectively unreasonable for a defense attorney in a first degree murder case to not conduct an investigation. Regarding Petitioner's case, Mr. Lannom opined that a reasonable investigation would have included trial counsel's visiting the three crime scenes, interviewing the witnesses that saw Petitioner with the victim, and interviewing the "very important witness[,]" Kim Daniels. Mr. Lannom noted that the crime occurred in Jackson County but that counsel went to Clay County to obtain records of some of the witnesses, which Mr. Lannom described as a "very appropriate and proper thing to do."

When asked about trial counsel's failure to request that the trial court charge the jury with attempt, Mr. Lannom explained that such a request had to be in writing. He continued, "[I]f you want a jury instruction and there is a statute on point that requires you to have it in writing to preserve that issue, you have fallen below the standard of reasonableness if you don't file the written instruction." Mr. Lannom said that, although trial counsel testified that he wanted an attempt instruction, it was a "very strained attempt argument." Mr. Lannom stated that, in his review, he "didn't really find a lot of trial information . . . to support the attempt instruction." However, Mr. Lannom testified that, based on counsel's testimony that he wanted the jury instructed on attempt, counsel's failure to file a written instruction "fell below the objective standard of reasonableness for trial counsel in this case." Mr. Lannom noted that trial counsel's failure to file a written request resulted in a finding that the issue was waived on direct appeal. Mr. Lannom agreed that, if trial counsel had properly preserved the issue of the attempt instruction for appeal, the appellate court would have utilized "a much easier standard of review[.]"

Regarding trial counsel's failure to request that the trial court instruct the jury on facilitation of a felony, Mr. Lannom testified that there was "no tactical reason" for counsel not to request the instruction after the trial court granted the State's request that it charge criminal responsibility. Mr. Lannom noted that counsel's failure to request an instruction on facilitation resulted in a finding that the issue was waived on direct appeal. He explained that the appellate court reviewed the issue for plain error rather than the harmless error test for non-structural constitutional error. He testified that, by failing to request the instruction on facilitation of a felony, trial counsel fell below the standard of care required for defense counsel. He testified that, if counsel had made a written request for the instruction, "[i]t would have been a far less strict standard of review which can't help but directly increase [Petitioner's] chance of success on appeal had it been reviewed under that standard."

At the conclusion of the hearing, the post-conviction court took the matter under advisement. The post-conviction court subsequently entered an order making findings of fact and conclusions of law and denying post-conviction relief. The court found that trial counsel's investigation efforts fell within the range of reasonable, competent representation. The court further determined that trial counsel "was not investigating or contesting facts covered by the [State's] experts as he did not believe those facts were at issue" and noted that "[w]asting time and money on uncontested facts serves no purpose."

The post-conviction court addressed, as one issue, Petitioner's claims that trial counsel failed to preserve meritorious objections for appeal and failed to object to the trial court's failure to instruct the jury on proper lesser-included offenses. The court determined that because trial counsel believed that the trial court should have instructed the jury on attempt, trial counsel was deficient in failing to object when the trial court indicated that it would not give the instruction. However, the post-conviction court found that the record did not establish that such a preserved claim would have been meritorious on appeal. The court explained that Petitioner had failed to show prejudice, stating:

> This Court did hear the Motion for New Trial and is not satisfied the proof would have reasonably supported an attempt conviction. Petitioner was convicted of First Degree Murder, the actual indicted offense. DNA evidence of both [Petitioner] and the victim were found in the truck at the scene where the body was found. The victim was found deceased having been shot in the back of the head. Jurors are to only consider lesser included offenses if a unanimous verdict of not guilty is made on the more serious charge. Jurors are presumed to follow and abide by the instructions as written. Therefore[,] the jury would never have even considered the charge of Criminal Attempt.

The post-conviction court found that trial counsel's failure to request a jury instruction on facilitation of a felony was not a tactical decision by trial counsel. The court noted Mr. Lannom's testimony that the failure to request such an instruction after the trial court granted the State's request to charge criminal responsibility constituted deficient performance. The court stated that it accredited Mr. Lannom's testimony on the issue and found trial counsel's performance "to be deficient, though it is mitigated by the fact the issue came up somewhat unexpectedly at the very end of the trial." However, the court found that Petitioner had failed to establish prejudice and denied relief.

This timely appeal follows.

## Analysis

To prevail on a petition for post-conviction relief, a petitioner must prove all factual allegations by clear and convincing evidence. *Jaco v. State*, 120 S.W.3d 828, 830 (Tenn. 2003). Post-conviction relief cases often present mixed questions of law and fact. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Appellate courts are bound by the post-conviction court's factual findings unless the evidence preponderates against such findings. *Kendrick v. State*, 454 S.W.3d 450, 457 (Tenn. 2015). When reviewing the post-conviction court's factual findings, this court does not reweigh the evidence or substitute its own inferences for those drawn by the post-conviction court. *Id.*; *Fields*, 40 S.W.3d at 456 (citing *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997)). Additionally, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the [post-conviction court]." *Fields*, 40 S.W.3d at 456 (citing *Henley*, 960 S.W.2d at 579); *see also Kendrick*, 454 S.W.3d at 457. The post-conviction court's conclusions of law and application of the law to factual findings are reviewed de novo with no presumption of correctness. *Kendrick*, 454 S.W.3d at 457.

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee.c U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In order to receive post-conviction relief for ineffective assistance of counsel, a petitioner must prove: (1) that counsel's performance was deficient; and (2) that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (stating that the same standard for ineffective assistance of counsel applies in both federal and Tennessee cases). Both factors must be proven for the court to grant post-conviction relief. *Strickland*, 466 U.S. at 687; *Henley*, 960 S.W.2d at 580; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Accordingly, if we determine that either factor is not satisfied, there is no need to consider the other factor. *Finch v. State*, 226 S.W.3d 307, 316 (Tenn. 2007) (citing *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004)). Additionally, review of counsel's performance

"requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689; *see also Henley*, 960 S.W.2d at 579. We will not second-guess a reasonable trial strategy, and we will not grant relief based on a sound, yet ultimately unsuccessful, tactical decision. *Granderson v. State*, 197 S.W.3d 782, 790 (Tenn. Crim. App. 2006).

As to the first prong of the *Strickland* analysis, "counsel's performance is effective if the advice given or the services rendered are within the range of competence demanded of attorneys in criminal cases." *Henley*, 960 S.W.2d at 579 (citing *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)); *see also Goad*, 938 S.W.2d at 369. In order to prove that counsel was deficient, the petitioner must demonstrate "that counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688); *see also Baxter*, 523 S.W.2d at 936.

Even if counsel's performance is deficient, the deficiency must have resulted in prejudice to the defense. *Goad*, 938 S.W.2d at 370. Therefore, under the second prong of the *Strickland* analysis, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. (quoting *Strickland*, 466 U.S. at 694) (internal quotation marks omitted).

*1. Failure to conduct a reasonable investigation*

Petitioner contends that trial counsel rendered ineffective assistance by failing to conduct a reasonable investigation or utilize a criminal defense investigator. "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691; *see also State v. Burns*, 6 S.W.3d 453, 462 (Tenn. 1999). However, "when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable." *Strickland*, 466 U.S. at 691.

In denying relief, the post-conviction court found that trial counsel's investigation efforts fell within the range of reasonable competent representation. The court further determined that trial counsel "was not investigating or contesting facts covered by the [State's] experts as he did not believe those facts were at issue[.]"

- 16 -

The record supports the post-conviction court's determination that Petitioner failed to show deficient performance. Trial counsel said that, during his representation of Petitioner, he and Petitioner communicated through letters and that he met with Petitioner "quite a bit." Trial counsel stated that he was given "a lot of discovery" and that he went over discovery thoroughly with Petitioner. He said that he took his laptop to Petitioner and that they listened to the audiotapes. Trial counsel stated, "As far as spending time with a client, I . . . spent more time with [Petitioner] . . . than any other client I've represented in [forty] years." Trial counsel testified that he also spoke to family members and some of the witnesses about Petitioner. He explained that he "went to Clay County and went over to the apartment building" with another assistant public defender and one of their investigators and that they spoke to several people there. He stated that he also interviewed Kim Daniels numerous times. Trial counsel said that he obtained additional statements from witnesses from the discovery provided by the State. Trial counsel stated that he investigated Robert Daniels and obtained a copy of the indictment against him. Trial counsel also went to the courthouse in Clay County and obtained the criminal record for one of the witnesses. When asked if there was further investigation that he should have pursued in the case, counsel responded:

> Not that I'm aware of because I feel like I had, with discovery and what I knew about the case, the major players in it, I mean, I'm not aware of any witness out there. In all these years nobody has come forward as being a material witness that I know about.

Trial counsel further stated that he did not recall there being any additional witnesses that Petitioner had wanted him to investigate. We agree with the post-conviction court that counsel was not deficient in his investigation into Petitioner's case.

Moreover, Petitioner has not established prejudice. Although Petitioner asserts in his brief that "[a]dequate investigation would have likely uncovered important exculpatory evidence" on his behalf, he failed to present any proof at the post-conviction hearing regarding what any further investigation would have yielded, and this court cannot "speculate or guess on the question of whether further investigation would have revealed a material witness or what a witness's testimony might have been if introduced by defense counsel." *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). Petitioner is not entitled to relief on this claim.

*2. Failure to object to the trial court's decision not to instruct the jury on attempt*

Petitioner contends that trial counsel rendered ineffective assistance of counsel based on counsel's failure to object, and properly preserve the issue for direct appeal, when the trial court indicated it would not charge the jury with attempt. The post-conviction

court determined that because trial counsel believed an attempt instruction was appropriate, counsel was deficient in failing to object when the trial court indicated that it would not give the instruction. However, the post-conviction court found that Petitioner failed to establish prejudice by showing that such a preserved claim would have been meritorious on appeal. We agree with the post-conviction court that Petitioner failed to establish the prejudice prong of the *Strickland* analysis.

Our supreme court has held that "where the evidence clearly establishes the completion of the crime, it is unnecessary for the trial court to charge the jury as to attempt or solicitation." *State v. Banks*, 271 S.W.3d 90, 127 (Tenn. 2008); *see also State v. Marcum*, 109 S.W.3d 300, 304 (Tenn. 2003). The trial court is required to charge a lesser-included offense only when "the judge determines that the record contains any evidence which reasonable minds could accept as to the lesser included offense." Tenn. Code Ann. § 40-18-110(a) (2010).

On direct appeal, this court explained:

[T]here was uncontroverted evidence that the victim was killed as the result of a shotgun wound to the back of the head. There was no evidence in the record to support [Petitioner's] speculation that the jury "might have found" that [Petitioner] attempted to kill the victim but was beaten to the punch by his uncle. Instead, the State's theory was that [Petitioner] shot the victim in the back of the head, stripped him either before or after the crime, and disposed of his body down an embankment, while [Petitioner's] theory was that [Petitioner's] uncle, acting under provocation, shot the victim in a struggle over a shotgun.

*Joe Edward Daniels*, 2017 WL 1032743, at *11. The court concluded, therefore, that the proof at trial "established only a completed crime" and that "there was no error in the trial court's failure to charge attempt." *Id.* Moreover, at the post-conviction hearing, Petitioner's own expert testified that the argument in support of an attempt instruction was "very strained" and that, in his review, he "didn't really find a lot of trial information . . . to support the attempt instruction."

Petitioner has not established that an appellate court would have granted him relief had this issue been properly preserved by trial counsel. In other words, even if trial counsel had formally objected, Petitioner has not shown a reasonable probability that the outcome of his trial would have been different. *Goad*, 938 S.W.2d at 370. He is not entitled to relief on this basis.

### 3. Failure to request a jury instruction on facilitation of a felony

Petitioner asserts that trial counsel rendered ineffective assistance based on counsel's failure to request a jury instruction on facilitation of a felony. The post-conviction court found that trial counsel's failure to request a jury instruction on facilitation of a felony was not a tactical decision by trial counsel. The court accredited Mr. Lannom's testimony that the failure to request such an instruction after the trial court granted the State's request to charge criminal responsibility constituted deficient performance. However, the post-conviction court found that Petitioner had failed to establish prejudice. We agree with the post-conviction court's determination.

This court concluded on direct appeal that the trial court's "error in not charging facilitation was harmless beyond a reasonable doubt." *Joe Edward Daniels*, 2017 WL 1032743, at *18. The court reasoned:

> In evaluating the effect of error, we examine [Petitioner's] theory of the case, the verdict, and the evidence at trial. [Petitioner's] theory of the case was that he did not assist his uncle to commit the offense in any way. Defense counsel argued in closing that "the struggle was [between] Robert Daniels and [the victim], not [Petitioner]." The prosecutor's closing argument also rejected the theory that [Petitioner] aided his uncle in committing the crime, calling the theory a "smoke screen," "inconceivable," and "not reasonable."

*Id.* (citation omitted). This court further concluded that the proof that Petitioner was the principal offender was strong, stating:

> The proof in this case showed that [Petitioner] drove the victim, who was disabled, away from his home in a white truck wearing a baseball cap. [Petitioner's] white truck, covered in the victim's blood and bearing [Petitioner's] bloody fingerprints, was discovered wrecked later that night, and a baseball cap with DNA consistent with [Petitioner's] was located nearby. The victim's nude body was found near the truck the next day. The victim had died from a shotgun wound in the back of the head, and the medical examiner opined that the "wound pattern" could be caused by a struggle but that the wound and a struggle were "mutually exclusive." The night of the homicide, [Petitioner] returned to his wife and asked her to bandage a wound on his head. He did not say anything about witnessing a homicide. Instead, he left that night for Indiana, later asking his wife to report that his truck was stolen. He stayed in a hotel under a false name before turning himself in to authorities. [Petitioner's] version of events, that

- 19 -

the victim was accidentally shot by his uncle in a struggle over a gun, did not account for the victim's nudity or the medical examiner's testimony that the wound was not consistent with a struggle.

*Id.* (citation omitted).

Because the proof that Petitioner was the principal offender was strong and because the defense theory of the case was that Petitioner did not assist his uncle to commit the offenses in any way, Petitioner has not shown a reasonable probability that the outcome of trial would have been different if trial counsel had sought an instruction on facilitation. *Goad*, 938 S.W.2d at 370. Petitioner has not shown prejudice under *Strickland* and is, therefore, not entitled to relief on this claim.

### 4. Cumulative effect of deficient performance

Lastly, Petitioner asserts that the aggregate prejudicial effect of counsel's deficient performance warrants the granting of a new trial. He contends that, due to trial counsel's deficient performance, his trial was fundamentally unfair. We disagree. Petitioner was not deprived of a meaningful defense, and he has not shown that the reliability of the verdict is in question. *See State v. Taylor*, 968 S.W.2d 900, 912 (Tenn. Crim. App. 1997). Petitioner is not entitled to relief.

### Conclusion

Based on the foregoing, we affirm the judgment of the post-conviction court.

_____
ROBERT L. HOLLOWAY, JR., JUDGE

- 20 -